
# IN THE SUPREME COURT OF GUAM

**PEOPLE OF GUAM,**
Plaintiff-Appellee,

**v.**

**JAYSON FRANCISCO SONG,**
Defendant-Appellant.

## OPINION

## Cite as: 2021 Guam 14

Supreme Court Case No.: CRA20-003
Superior Court Case No.: CF0710-16

Appeal from the Superior Court of Guam
Argued and submitted on April 8, 2021
Via Zoom video conference

Appearing for Defendant-Appellant:
Terry E. Timblin, *Esq.*
Ada's Capitol Plaza Bldg.
120 Father Duenas Ave., Ste. 105B
Hagåtña, GU 96910

Appearing for Plaintiff-Appellee:
Christine Santos Tenorio, *Esq.*
Assistant Attorney General
Office of the Attorney General
Prosecution Division
590 S. Marine Corps Dr., Ste. 901
Tamuning, GU 96913

E-Received
10/21/2021 9:25:41 AM

BEFORE: F. PHILIP CARBULLIDO, Chief Justice; ROBERT J. TORRES, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**CARBULLIDO, C.J.:**

[1]     Defendant-Appellant Jayson Francisco Song appeals from a final judgment of conviction finding him guilty of Delivery of a Schedule II Controlled Substance (As a First Degree Felony); Possession of a Schedule II Controlled Substance (As a Third Degree Felony), as a lesser-included offense of Possession of a Schedule II Controlled Substance with Intent to Deliver (As a First Degree Felony); and Possession of a Schedule II Controlled Substance (As a Third Degree Felony).  He argues the evidence was insufficient to satisfy the charge of Delivery of a Schedule II Controlled Substance and one charge of Possession of a Schedule II Controlled Substance, and therefore the trial court erred in denying his motion for judgment of acquittal as to those charges.  For the reasons below, we affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

[2]     The following evidence was presented at trial.  On the evening of November 2, 2016, G.A.M., then 17 years old, was at the Guam Premier Outlets ("GPO"), waiting for her boyfriend to get off work.  Around 7:00 p.m., while looking at cellphone cases at the IT&E kiosk in front of Ross, she was approached by Defendant-Appellant Jayson Francisco Song.  G.A.M. knew Song, as he was her father's childhood best friend and the godfather of G.A.M.'s sister.  As it had been several years since she had last seen Song, they chatted about her family as they walked outside to the parking lot and toward Song's truck, which was parked on the side of the Forever 21 building, at the bottom of a staircase.

[3]     At the truck, G.A.M. said goodbye and turned to head back to GPO, but Song held her arm and told her to get in the truck.  G.A.M. testified that Song's demeanor had changed, and she

noticed a knife in the center console of the truck. Afraid, she got in the passenger side of the truck. Once in the truck, Song asked G.A.M. if she smoked anything before. G.A.M. was not sure what he meant, but she assumed he was asking if she smoked cigarettes or drugs like marijuana or methamphetamine. She told Song she did not smoke. He took out a glass pipe from a little black pouch and told her to smoke from it. She asked him what it was, and he replied it was just a water bong. When she asked him again whether it was just water, he giggled and said, "Yeah, it's just water." Transcript ("Tr.") at 68 (Jury Trial, Oct. 15, 2019). G.A.M. described the contents of the pipe as a clear liquid. G.A.M. refused to smoke from the pipe, but eventually inhaled from it after Song insisted several times and "got louder." *Id.* After G.A.M. inhaled from the pipe, Song became upset and said she did it wrong and told her to smoke again. G.A.M. did not know how she was supposed to smoke it, so she inhaled again, and Song said nothing and just continued to smoke. According to G.A.M., after Song first put the pipe at her mouth, he took out a Ziploc bag "I guess, to put more of whatever was in there." Tr. at 12 (Jury Trial, Oct. 16, 2019).

[4]     G.A.M. testified that after inhaling from the pipe, her heart started to "pump a lot faster," but she was not sure if that was an effect of what she had just smoked or because she was fearful of what was happening. Tr. at 69-70 (Jury Trial, Oct. 15, 2019).

[5]     G.A.M. then testified to acts of sexual contact and penetration by Song, which she alleged were non-consensual. After these acts, Song drove away from GPO. G.A.M. asked where they were going, but he did not specify. A few minutes later, Song parked in front of his residence in the Jonestown area of Tamuning. G.A.M. testified that he again sexually penetrated her without her consent.

**[6]** While still in the truck outside his residence, Song made a phone call. During the phone call, Song told the person on the other end that he just saw her pass by and instructed her to turn around. A woman pulled up in a vehicle. G.A.M. did not know the woman. Song asked the woman to drop G.A.M. back to GPO, but the woman refused. Song then said he needed to go to the ATM, so he drove to Oka Payless. G.A.M. waited in the truck while Song went into the store. She noticed the woman was parked at Payless. After Song exited Payless, he went over to the woman's vehicle and returned to his truck with a Ziploc bag which G.A.M. suspected contained drugs.

**[7]** After Song returned to the truck, he drove toward GPO but parked at the Tamuning Gym. There, according to G.A.M., Song again sexually penetrated her until she stopped him and said she would just walk to GPO if he would not drop her. Song then drove to GPO and parked in front of the same staircase where he had parked earlier in the evening. As G.A.M. exited the truck, Song threw a clear Ziploc bag at G.A.M. G.A.M. assumed the bag contained drugs, since she had seen Song take something out of a Ziploc bag earlier when he loaded the glass pipe. G.A.M. threw the bag back at Song and said she neither needed nor wanted it. She then ran toward GPO and was picked up by her boyfriend.

**[8]** At trial, the People called Maria Cepeda to testify. She was identified as the woman who met Song and drove to Oka Payless on the night of November 2, 2016, and the woman with Song at the time of his arrest. Cepeda testified that on the night of November 2, Song called her for a "deal," meaning he called her to buy "ice," i.e., "crystal meth." Tr. at 16-17, 21 (Jury Trial, Oct. 29, 2019). When she got to his house, she saw a female with Song. Song did not have money, so they each drove their respective vehicles to the ATM at Payless. At Payless, Cepeda saw the same girl waiting in Song's truck. Cepeda said the girl "was smiling when I saw her" and "was

fixing her hair [in] the mirror." *Id.* at 21. When Cepeda was asked whether the girl exhibited any signs of having used meth, she testified that the girl acted nervous and was fidgeting. Afterward, Song gave Cepeda $150, and she gave him half of a gram of ice in a clear, plastic baggie.

[9]     G.A.M. reported the events of November 2 to the Guam Police Department ("GPD"). On December 1, 2016, GPD arrested Song at the Oka Payless parking lot. Song had a glass pipe in his possession, with residue that later tested positive for crystal methamphetamine. During his interview with police, Song told Officer Frank Santos that the pipe was different from the pipe he had on November 2, as that pipe had since broken. When Officer Santos asked Song to identify the substance he gave G.A.M. to smoke on November 2, Song replied, "You already know what it is. You found the pipe on me." Tr. at 35, 38 (Jury Trial, Oct. 25, 2019). Officer Santos testified that he took this to mean the drug known as "ice," a nickname for crystal methamphetamine. *Id.* at 38. Song also told Officer Santos that the purpose of going to the ATM on the night of November 2 was to pay Cepeda for the "stash" he bought. *Id.* at 41. When asked what he meant by "stash," Song responded that the officer "already knew what it was because [the officer] found [Song's] pipe on him." *Id.*

[10]    Several other police officers testified for the People. Officer Joel Terlaje testified that based on his experience of being involved in several arrests for methamphetamine, some effects of methamphetamine use are increased heart rate and hyperactivity, such as fidgeting. Officer Joseph Aguon testified that during his interview with Cepeda, she told him that the girl with Song looked like a new user of crystal methamphetamine. Officer Aguon also testified that based on his training and experience as a narcotics detective, when users are high on methamphetamine, "[t]hey're usually fidgeting, always moving, unable to keep still." Tr. at 68

(Jury Trial, Oct. 29, 2019). Officer Michael Ramos testified that during his interview of G.A.M., when he asked her whether the substance she smoked had a certain smell or scent, she replied that it "[d]idn't smell like anything." Tr. at 23 (Jury Trial, Oct. 15, 2019).

[11] The People also called Arthur Perez, the criminalist who tested the residue in the pipe confiscated from Song on December 1. Perez testified that he performed a "color test" on the residue—"a presumptive test that would tell you what may be inside the compound of interest." Tr. at 18 (Jury Trial, Oct. 25, 2019). Perez described that after using a reagent on a sample of the residue, the residue "reacted with an orange to brown color change, and that is a presumptive positive for the amphetamine family." *Id.* He performed two other tests of the residue, the results of which showed that the residue was consistent with methamphetamine hydrochloride and methamphetamine.

[12] The grand jury charged Song with: (1) four counts of First Degree Criminal Sexual Conduct; (2) one count of Second Degree Criminal Sexual Conduct; (3) Delivery of a Schedule II Controlled Substance with a Special Allegation of Delivery of a Controlled Substance to a Minor, for intentional or knowing delivery of an amphetamines-based substance on November 2, 2016; (4) Possession of a Schedule II Controlled Substance with Intent to Deliver, for unlawful and knowing possession with intent to deliver an amphetamine-based substance on November 2, 2016; and (5) Possession of a Schedule II Controlled Substance, for unlawful and knowing possession of an amphetamine-based substance on December 1, 2016.

[13] The case proceeded to a 14-day jury trial. Song moved for judgment of acquittal at the close of the People's case-in-chief, and renewed his motion at the close of all the evidence. The trial court denied both motions. The jury found Song guilty of the Third Charge, Delivery of a Schedule II Controlled Substance (As a First Degree Felony); Possession of a Schedule II

Controlled Substance (As a Third Degree Felony), as a lesser-included offense of the Fourth Charge of Possession of a Schedule II Controlled Substance with Intent to Deliver, for the possession arising on November 2, 2016 ("November 2 possession charge"); and the Fifth Charge of Possession of a Schedule II Controlled Substance (As a Third Degree Felony), for the possession arising on December 1, 2016 ("December 1 possession charge"). The jury found Song not guilty of all other charges.

[14]     The trial court sentenced Song to 8.5 years of imprisonment for the Third Charge of Delivery of a Schedule II Controlled Substance, with credit for time served and a potential suspension of 3 years of the sentence after successful completion of a residential substance abuse treatment program. For the November 2 possession charge, "any sentence imposed would merge with the charge of Delivery of a Schedule II Controlled Substance." Record on Appeal ("RA"), tab 296 at 3 (Judgment, Mar. 3, 2020). The trial court sentenced Song to 4 years of imprisonment for the December 1 possession charge, to run concurrent to his 8.5-year prison term for Delivery of a Schedule II Controlled Substance. The trial court entered a final judgment, and Song timely appealed.

## II.  JURISDICTION

[15]     This court has jurisdiction over an appeal from a final judgment of conviction under 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 117-50 (2021)), 7 GCA §§ 3107 and 3108(a) (2005), and 8 GCA § 130.15(a) (2005).

## III.  STANDARD OF REVIEW

[16]     "Where a defendant raise[d] the issue of sufficiency of the evidence by a motion for judgment of acquittal, we review the trial court's denial of the motion *de novo*." *People v. Aguon*, 2020 Guam 24 ¶ 11 (quoting *People v. George*, 2012 Guam 22 ¶ 47).

## IV. ANALYSIS

[17]     Song argues the evidence was insufficient to convict him of Delivery of a Schedule II Controlled Substance and Possession of a Schedule II Controlled Substance (as a lesser-included offense of possession with intent to deliver) for the allegations stemming from November 2, 2016.[1]  He does not appeal his conviction for the December 1 possession charge.

[18]     In determining whether there is sufficient evidence to sustain Song's convictions, "we review the evidence in the light most favorable to the People and determine whether any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." *People v. Wia*, 2020 Guam 17 ¶ 35 (citing *People v. Song*, 2012 Guam 21 ¶ 26); *see also* 8 GCA § 90.21(a) (2005) ("No person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt.").  "This is a 'highly deferential standard of review.'" *Wia*, 2020 Guam 17 ¶ 35 (quoting *Song*, 2012 Guam 21 ¶ 26).  "[T]he People 'must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom.'" *Id.* (alteration in original) (quoting *Song*, 2012 Guam 21 ¶ 28).

[19]     "It is not the province of the court, in determining [a motion for a judgment of acquittal], to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." *Id.* ¶ 36 (alterations in original) (quoting *Song*, 2012 Guam 21 ¶ 29).  "The court is concerned with the

---

[1] The following is the language from the superseding indictment on the delivery charge:

> On or about the 2ⁿᵈ day of November, 2016, in Guam, **JAYSON FRANCISCO SONG** did commit the offense of ***Delivery of a Schedule II Controlled Substance***, in that he intentionally or knowingly delivered a schedule II controlled substance, that is, an amphetamines-based substance, in violation of 9 GCA §§ 67.401.1(a)(1) and (b)(1).

Record on Appeal ("RA"), tab 25 at 3 (Superseding Indictment, Jan. 26, 2017).  Possession of a Schedule II Controlled Substance as a lesser-included offense to Charge 4, Possession of a Schedule II Controlled Substance with Intent to Deliver, required proof that Song "unlawfully and knowingly possessed . . . a Schedule II controlled substance, that is, an amphetamine-based substance." *Id.*; *see also id.* at 4 (December 1 possession charge); RA, tab 262 at 72 (Jury Instrs., Nov. 14, 2019) (listing essential elements of lesser-included offense of Possession of a Schedule II Controlled Substance).

existence or nonexistence of evidence, not its weight, and this standard remains constant even when the People rely exclusively on circumstantial evidence." *Id.* (citing *Song*, 2012 Guam 21 ¶ 29). "[I]f there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find the case was properly submitted to the jury." *Song*, 2012 Guam 21 ¶ 29 (quoting *State v. Elmore*, 628 S.E.2d 271, 273 (S.C. Ct. App. 2006)).

[20]     Song argues no physical evidence was presented to prove the substance in the pipe on November 2. Appellant's Br. at 10 (Nov. 20, 2020) ("Neither the bong nor the Ziplock [sic] was recovered or tested."). He points to G.A.M.'s inability to identify either the substance in the pipe or the substance in the Ziploc bag that Song threw to her. *Id.* Song also points to his refusal to tell the interviewing officer what was in the pipe on November 2 and G.A.M.'s testimony that Song told her the pipe contained only water. *Id.* Song proposes that the evidence that he told G.A.M. the November 2 pipe was a water bong implied that the pipe was the type used to smoke marijuana rather than methamphetamine. Oral Argument at 10:10:36–10:11:07 (Apr. 8, 2021). Song argues that because of these deficiencies, the evidence was insufficient to prove that he either delivered or possessed a Schedule II Controlled Substance on November 2, warranting reversal of those convictions. Appellant's Br. at 10-11.

[21]     The People respond that "there was sufficient evidence that the substance in the glass pipe on November 2 was an amphetamines-based substance based on Song's admissions regarding the December 1 pipe, noting that Guam does not follow the corpus delicti doctrine." Appellee's Br. at 5 (Dec. 23, 2020) (citing *People v. Kintaro*, 1999 Guam 15 ¶ 13).[2] The People

---

[2] "According to the corpus delicti doctrine, 'in order to convict a defendant of a crime based upon an extra-judicial confession or statement, the defendant's statement must be corroborated by some evidence of the corpus delicti.'" *People v. Kintaro*, 1999 Guam 15 ¶ 13 (quoting *Gov't of Virgin Islands v. Harris*, 938 F.2d 401, 409 (3rd Cir. 1991)). In *Kintaro*, this court rejected this doctrine and adopted the "trustworthiness doctrine,"

argue that "[t]his court has recognized that entirely circumstantial evidence is sufficient to support a guilty verdict, and this rule is applicable to drug cases." *Id.* at 6 (citing *People v. Mateo*, 2017 Guam 22 ¶ 38). The People contend that Song's statements on December 1 prove by implication that the substance on November 2 was methamphetamine. *Id.* at 6-7. The People point to Song's admission that he and G.A.M. smoked from his pipe on November 2 and his remark that the interrogating officer already knew what was in the November 2 pipe because of the pipe found on him on December 1. *Id.* at 6-7. The People argue Song's response constituted an implied admission that the November 2 pipe contained methamphetamine, since the residue in the December 1 pipe tested positive for methamphetamine. *Id.* at 7. The People also point to Cepeda's testimony that she sold half a gram of "ice" to Song on November 2 and Song's statement that he paid Cepeda for "stash" on November 2 as evidence he was in possession of an amphetamines-based substance on November 2.

[22]    The People also argue that caselaw recognizes that scientific identification is not an absolute prerequisite for a drug-related offense, *id.* at 7-8 (citing *Mateo*, 2017 Guam 22 ¶ 38), and that "[c]ourts have held that the prosecution need not physically produce the narcotic in narcotics cases, even in jurisdictions that follow the corpus delicti doctrine requiring corroboration of the defendant's statements by some evidence of the corpus delicti," *id.* at 8 (citing cases). The People cite a California case where the court held that the jury could weigh circumstantial evidence such as the description of the drug transaction, the effects of the drug on the user, and expert testimony on the effects of the drug. *Id.* (citing *People v. Candalaria*, 264 P.2d 71, 73 (Cal. Dist. Ct. App. 1953)). The People argue that G.A.M.'s testimony that her heart

---

which "provides that 'direct proof of the corpus delicti is not required; the evidence may even be collateral to the crime itself.'" *Id.* ¶¶ 13-14 (quoting *Harris*, 938 F.2d at 409). "The two doctrines differ in that the trustworthiness doctrine emphasizes the reliability of the defendant's confession over the independent evidence of the corpus delicti." *Id.* ¶ 13.

started to pump faster after she smoked, her description of the pipe and the substance in the clear plastic baggie, Cepeda's testimony that she observed G.A.M. fidgeting in the truck, and Song's implied admissions about the substance as sufficient evidence that Song gave G.A.M. crystal methamphetamine on November 2. *Id.* at 9.

[23] Given the testimony and the highly deferential standard of review, we agree with the People that the evidence was sufficient to prove the delivery and possession charges relating to November 2. It is well-settled in our caselaw that circumstantial evidence alone can constitute sufficient evidence for a conviction. *See People v. McKinney*, 2016 Guam 3 ¶ 22 ("'[E]ntirely circumstantial' evidence is sufficient to support a guilty verdict." (citations omitted)); *Song*, 2012 Guam 21 ¶ 29 ("[I]f there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find the case was properly submitted to the jury." (quoting *Elmore*, 628 S.E.2d at 273)); *People v. Jesus*, 2009 Guam 2 ¶ 62 ("In a sufficiency of the evidence analysis, courts determine whether there is sufficient direct and/or circumstantial evidence from which reasonable inference can be drawn to support each element of the crime or crimes charged."). "Multiple courts have held that this general rule holds true in drug cases as well." *Mateo*, 2017 Guam 22 ¶ 38 (citing cases).

[24] Although the People were unable to produce physical or scientific proof that the substance in the November 2 pipe was an amphetamines-based substance, the People put on substantial circumstantial evidence to prove this element of the delivery and possession charges. G.A.M. testified that Song took something out of a clear plastic baggie and placed it into the pipe, and she described the substance in the pipe as a clear liquid. She also testified that soon after smoking the substance, her heart began to "pump a lot faster." Tr. at 69-70 (Jury Trial, Oct. 15, 2019). G.A.M. testified that Song threw a clear Ziploc bag to her as she was exiting the

truck, and she described the substance in the bag as "rocks." Tr. at 70 (Jury Trial, Oct. 17, 2019) (responding "Yes" to defense counsel's question that bag contained substance G.A.M. "thought was rocks"). Cepeda observed that G.A.M. appeared nervous and was fidgeting, displaying what she thought to be signs of a new user of methamphetamine. Multiple witnesses consistently testified that increased heart rate and fidgeting were some effects of methamphetamine use.

[25] Additionally, a rational trier of fact could view Song's responses to the interrogating officer on December 1—the night of his arrest—as implied admissions he gave G.A.M. methamphetamine on November 2. When he was asked whether the December 1 pipe was the same pipe he had on November 2, Song told the officer it was a different pipe because the other pipe had broken—implying that the two pipes were similar and not used to smoke different substances. While Song did not directly identify the November 2 substance as methamphetamine, he responded to the officer multiple times that the officer already knew what was in the pipe on November 2 because the officer found a pipe on him on December 1, which implied that the substance smoked on November 2 was the same substance found in the December 1 pipe. Because the residue in the December 1 pipe tested presumptively positive as a substance in the "amphetamine family" and as consistent with "methamphetamine hydrochloride" and "methamphetamine," Tr. at 18-20 (Jury Trial, Oct. 25, 2019), a reasonable jury could infer from Song's statements that he and G.A.M. smoked methamphetamine on November 2. Moreover, Cepeda provided direct testimony that she sold half a gram of methamphetamine to Song on November 2 at the Payless parking lot, which alone is sufficient to prove the November 2 possession charge.

[26] Although G.A.M. could not positively identify the substance she smoked and testified that Song described the pipe as a "water bong," that Song identified the substance as "just

water," Tr. at 68 (Jury Trial, Oct. 15, 2019), and that G.A.M. did not know the exact reason for her increased heart rate while smoking the substance, "[i]t is not the province of the court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." *Song*, 2012 Guam 21 ¶ 29 (quoting *State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005)). From the evidence, reasonable inferences can be drawn to support a finding by a rational trier of fact that the substance in the November 2 pipe was amphetamine-based. Thus, viewing the evidence in the light most favorable to the People, a rational trier of fact could have found the essential elements of Delivery of a Schedule II Controlled Substance and Possession of a Schedule II Controlled Substance beyond a reasonable doubt.

## V. CONCLUSION

[27] Because sufficient evidence exists to sustain Song's convictions for Delivery of a Schedule II Controlled Substance and Possession of a Schedule II Controlled Substance as a lesser-included offense of Possession of a Schedule II Controlled Substance with Intent to Deliver, we **AFFIRM**.

|  |  |
|---|---|
| /s/ | /s/ |
| ROBERT J. TORRES | KATHERINE A. MARAMAN |
| Associate Justice | Associate Justice |

/s/
F. PHILIP CARBULLIDO
Chief Justice